**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID E. ROGERS, on behalf of Himself and a Class of Persons Similarly Situated, and on behalf of the Baxter International Inc. and Subsidiaries Incentive Investment Plan, | ) ) ) ) ) | No. 04 C 6476 |
| Plaintiff, | ) ) | Judge Joan B. Gottschall |
| v. | ) ) | Magistrate Judge Nan R. Nolan |
| BAXTER INTERNATIONAL INC., the Administrative Committee, the Investment Committee, Brian P. Anderson, and Harry M. Jansen Kraemer, Jr., | ) ) ) ) ) | |
| Defendants. | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff David E. Rogers represents a class of participants in and beneficiaries of the Baxter International Inc. and Subsidiaries Incentive Investment Plan (the "Plan"). Rogers brings suit against Baxter International Inc. ("Baxter") and several related defendants for alleged breaches of fiduciary duties owed to the class under the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829 (codified as amended in scattered sections of 5 U.S.C., 18 U.S.C., 26 U.S.C., 29 U.S.C., and 42 U.S.C.). This case is presently before the court on defendants' motion for summary judgment and Rogers's motion for partial summary judgment.

# I.   FACTS[1]

## A.   Background[2]

Since 1985, Baxter, a seller of pharmaceuticals and other healthcare-related products, has maintained the Plan for its employees' 401(k) contributions.  (*See* Defs.' Resp. ¶ 1; *see also* Pl.'s Resp. ¶ 3.)   At the time of the events in question, the 1997 version of the Plan was in effect. (Defs.' Resp. ¶ 2.)   Baxter was the Plan's sponsor and had responsibility for investment matters relating to the Plan.   (Pl.'s Resp. ¶ 3; *see also* Defs.' Resp. ¶ 6.)   Two Baxter committees, the defendant Investment Committee and the defendant Administrative Committee, were responsible for administering and managing the Plan, and therefore were fiduciaries.  (Defs.' Resp. ¶¶ 3, 5.) Defendant Brian Anderson was Baxter's Chief Financial Officer, a member of the Administrative and Investment Committees, and a Plan fiduciary at all relevant times.   (*Id.* ¶ 5; Pl.'s Resp. ¶¶ 3-4.)   Defendant Harry M. Jansen Kraemer, Jr. was Baxter's Chief Executive Officer and Chairman of the Board of Directors at relevant times.

---

[1]     Citations are abbreviated as follows.   Corrected Plaintiff's Local Rule 56.1 Statement of Additional Material Facts is abbreviated "Pl's Add'l Stmt."   Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts is abbreviated "Pl.'s Resp."   Defendants' Response to Plaintiff's Local Rule 56.1(a)(3) Statement in Support of Plaintiff's Cross-Motion for Partial Summary Judgment is cited "Defs.' Resp."   Defendants' Responses to Plaintiff's Local Rule 56.1 Statement of Additional Facts are abbreviated "Defs.' Add'l Resp."   Exhibits to Plaintiff's Motion for Partial Summary Judgment on Count VI of the Third Amended Complaint are abbreviated "Pl.'s Ex."  The Appendix of Declarations, Deposition Testimony, and Other Documents Cited in Defendants' Local Rule 56.1(a)(3) Statement is abbreviated "Defs.' Ex."   The Appendix of Exhibits to Plaintiff's Response to Defendants' Motion for Summary Judgment is abbreviated "Pl.'s Resp. Ex."   Citations to any response to a statement of fact include both the statement responded to and the response.

[2]     A few preliminary notes regarding Rogers's Statement of Additional Facts are warranted.   First, several of Rogers's additional facts resemble arguments.   (*See, e.g.*, Pl's Add'l Stmt. ¶ 7 (asserting that Baxter had an "overriding objective behind this new vision of growth" without citing to any documents referencing an "overriding objective" or a "vision of growth").)   The court has not considered arguments presented as "facts."   Second, many of Rogers's statements rely on internal Baxter documents, in particular slide-show presentations, without pointing to any evidence suggesting which, if any, defendants reviewed, knew of, or should have known of the documents in question.   (*See, e.g.*, Pl.'s Ex. 21.)   The court has not considered documents for which Rogers provides no connection to defendants.   Third, several documents on which Rogers's additional facts are based are inadmissible, such as a newspaper story that is plainly hearsay.   *See* Pl.'s Resp. Ex. 68; *see also* Fed. R. Evid. 801(c) & 802.   Only admissible evidence is properly considered at summary judgment.   Fourth, several documents as filed by Rogers have truncated or missing bates numbers.   (*See, e.g.*, Pl.'s Resp. Exs. 45, 47, 48.)   Where the citation does not correspond to any page in the document, the court has considered the statement of fact unsupported.   Finally, several of Rogers's statements of fact post-date the period alleged in Rogers's Third Consolidated Amended Complaint, which alleges facts centered on Baxter's July 2002 announcement of disappointing sales growth.

Plaintiff Rogers is a participant in the Plan who elected to invest a portion of his contributions to the Plan in the Baxter Common Stock Fund. (Pl.'s Resp. ¶ 3.) He represents a class of investors who held stock in Baxter through their individual Plan accounts at any time between January 1, 2001 and the present. (*Id.* ¶ 2; *see also* Doc. Nos. 78-79.)

## B.     The Plan

The Plan was a defined-contribution plan, meaning each Plan participant had an individual account, the benefits of which were based solely on the amount contributed thereto. (Pl.'s Resp. ¶ 7.) Plan participants could make tax-deferred contributions to their respective accounts under § 401(k) of the Internal Revenue Code, 26 U.S.C. § 401(k), and Baxter matched those contributions up to a certain limit. (*Id.* ¶ 8.)

In addition to determining how much was invested in their individual accounts, Plan participants directed what investments to make. (Defs.' Resp. ¶¶ 11-13.) The Investment Committee offered Plan participants the opportunity to invest in seven different investment "funds," including five diversified funds, and offered a self-managed brokerage window through which Plan participants could invest in several thousand mutual funds. (*See* Pl.'s Resp. ¶ 42; *see also* Defs.' Ex. D-3, at 8-9.) Each fund was described in a Summary Plan Description ("SPD")[3] provided to Plan participants, *see* Pl.'s Resp. ¶ 42, Defs.' Ex. D-5, at 12, and Plan participants could obtain more detailed information regarding any fund on request. (Pl.'s Resp. ¶¶ 46, 54; *see also* Defs.' Resp. Ex. D ¶¶ 18, 27; Defs.' Ex. D-6, at BAXR 001977.) Plan participants would then direct the investment of their account assets in the funds of their choice. (*See* Pl.'s Resp. ¶¶ 57-63.)

---

[3]     Plan fiduciaries issued an SPD describing the 1997 Plan, and, in 2000, issued a Summary of Material Modifications to the SPD. (*See* Defs.' Exs. D-3 & D-4.) Fiduciaries issued a new SPD in connection with the updated Plan, which took effect in 2003. (*See* Defs.' Exs. D-5.) Unless otherwise stated, the 1997 SPD, as modified in 2000, is at issue here.

During the relevant period, the Baxter Common Stock Fund was among the seven funds that the Investment Committee selected to be investment options for participants in the Plan. (Defs.' Resp. ¶ 21; *see also* Pl.'s Resp. ¶ 16.)  SPDs provided Plan participants with information regarding voting and tender rights in Baxter common stock, and regarding confidentiality procedures related to transactions in Baxter common stock.  (Defs.' Resp. Ex. D-3, at 13-14.) The Plan also had procedures to ensure that participants could exercise voting, tender, and similar rights in a confidential manner.  (Pl.'s Resp. ¶ 68.)

## C.      Baxter's Commitments and Stock Price Decline

Each year, Baxter issued periodic financial guidance, which it termed "commitments," to the public.  (Defs.' Add'l Resp. ¶¶ 4, 26.)   These "commitments" forecasted financial information not just for Baxter generally, but also for each of Baxter's specific divisions.  (*Id.* ¶ 25.)   In October 2001, Baxter announced its commitments for 2002, which included commitments to "[a]ccelerate sales growth to the low-teens" and "[g]row earnings-per-share in the mid-teens."  (*Id.* ¶ 34; *see also* Pl.'s Resp. ¶ 20.)   As of its October 2001 announcement, Baxter had met its annual earnings and cash flow commitments for the seven previous years. (Pl.'s Resp. ¶ 21.)

In Baxter's Annual Report to shareholders, Kraemer indicated that the commitment, if realized, would be "our highest sales-growth rate in almost 20 years."  (Pl.'s Resp. Ex. 66, at 6.) While the commitments for 2002 exceeded Baxter's historical sales growth rate, Defs.' Add'l Resp. ¶¶ 45-46, they were consistent with internally projected sales growth.  (Pl.'s Resp. Ex. 52, at 10.)  Internally, Baxter noted that its commitments were "reasonable and realistic."  (*Id.* at 20.) Also internally, Baxter set a goal of increasing the value of Baxter common stock from $62.81 per share to over $200 per share.  (*See* Pl.'s Resp. Ex. 45, at 8.)

4

Baxter's growth continued through 2001, and on January 24, 2002, Baxter announced that it had met its commitments for the previous year, its eighth consecutive such year. (Pl.'s Resp. ¶ 22.) On the same day, however, Kraemer held a conference call with analysts in which he revised downward the expected growth of Baxter's renal and bioscience divisions. (*See* Pl.'s Resp. Ex. 22, at 18; *see also* Defs.' Add'l Resp. ¶ 63.) Throughout the first quarter of 2002, Baxter's renal division internally reported sales, sales growth, income, and cash flow that were short of previous estimates. (Defs.' Add'l Resp. ¶¶ 65, 67.)

On July 18, 2002, Baxter released its second quarter earnings results; in a conference call with analysts that day, Kraemer called Baxter's quarterly sales increase of eight percent "clearly disappointing." (*Id.* ¶ 68.) The specific reason for the lagging increase in sales appears to have been the renal division, which contemporaneously announced that its sales growth would be revised downward for the second time that year. (*Id.* ¶ 69.) In the same conference call, Kraemer reaffirmed that he expected that Baxter would meet its 2002 commitments. (*Id.* ¶¶ 70-71; *see also* Pl.'s Resp. ¶ 24.) That day, Baxter common stock dropped 26.3% in value. (Defs.' Add'l Resp. ¶ 72; *see also* Pl.'s Resp. ¶ 25.)

In late September 2002, an internal Baxter forecast projected sales growth for 2002 in the range of ten to twelve percent, slightly below the 2002 commitment of sales growth in the low teens, and earnings-per-share growth of thirteen to fourteen percent. (Defs.' Add'l Resp. ¶ 75.) On October 3, 2002, the company publicly announced revised 2002 commitments to reflect these lower expectations. (*Id.* ¶ 76.) On October 17, 2002 Baxter reiterated its revised 2002 commitments and also lowered its projections for its bioscience division; on the same day, the price of Baxter common stock dropped 8.6%. (*Id.* ¶¶ 78-79.) On January 22, 2003, Baxter announced that its sales increased ten percent in 2002 (short of the low-teens October 2001

5

commitment) and that its earnings per share increased thirteen percent (short of its mid-teens October 2001 commitment). (Pl.'s Resp. ¶ 27.)

From the beginning of 2002 to the end of 2003, Baxter had to revise its quarterly guidance downward seven times. (*Id.* ¶ 41.) During that time, Baxter's stock ranged from a high on March 27, 2002 of $59.60 to a low on April 1, 2003 of $18.56. (*Id.* ¶ 42.) In May 2003, Anderson, Baxter's chief financial officer, made a presentation in which, looking backward, he characterized previous commitments as "too optimistic." (*See* Pl.'s Resp. Ex. 51, at 6.) In July 2003, Kraemer informed the Board that Baxter's investor relations strategy was "shifting from a growth message to a value message." (Defs.' Add'l Resp. ¶ 89.) The Board minutes noting this proposed shift do not reflect the meaning of either term, or the history of Baxter's "growth message."

As the value of Baxter's common stock declined between 2002 and 2003, the assets of the Plan likewise declined in value. (Defs.' Resp. ¶¶ 34-36, 76-78.) While the value of Baxter common stock was declining, members of the Investment Committee did not discuss discontinuing the Baxter Common Stock Fund as an investment, although they did monitor the performance of each fund offered under the Plan, including the Baxter Common Stock Fund. (*Id.* ¶ 99.)

Despite the 2002-2003 stock decline, Baxter common stock remained less volatile and less systemically risky than the mean and median Standard & Poor's ("S&P") 100 Index companies. (Pl.'s Resp. ¶¶ 32-33.) Institutional investors, including pension funds, remained invested in Baxter common stock throughout the relevant period. (*Id.* ¶¶ 34-35.) Baxter common stock's total return to shareholders for each year from 2001 through 2008 was greater

than the returns of the S&P 500 Index and S&P Composite Healthcare Index, except in 2002, and outperformed those two indices for the class period as a whole.  (*Id.* ¶¶ 38-39.)

## II.    PROCEDURAL HISTORY

This case has taken several procedural turns already.  In 2005, defendants moved to dismiss the complaint.  The court denied that motion in part, specifically finding that ERISA afforded Rogers a private cause of action for losses that he suffered due to breaches of fiduciary duty even though he did not allege that all Plan participants suffered the same losses.  *See Rogers v. Baxter Int'l Inc.*, 417 F. Supp. 2d 974, 982 (N.D. Ill. 2006).   On interlocutory appeal, the Seventh Circuit affirmed.  *See Rogers v. Baxter Int'l Inc.*, 521 F.3d 702, 705 (7th Cir. 2008). After discovery, defendants moved for partial judgment on the pleadings, which the court granted in part.  *See Rogers v. Baxter Int'l Inc.*, No. 04 C 6476, 2009 WL 3378510 (N.D. Ill. Sept. 28, 2009).

Rogers then filed his Third Consolidated Class Action Complaint (the "Complaint"), which sets forth six claims.  Rogers alleges that defendants breached their fiduciary duties: by allowing Plan assets to be invested in Baxter common stock, the value of which, according to Rogers, was artificially inflated (Count I); by continuing to offer Plan participants an imprudent investment, namely, Baxter common stock (Count II); by misrepresenting certain facts and not disclosing others to Plan participants (Count III); by acting disloyally to Plan participants (Count IV); by failing to monitor other fiduciaries' breaches (Count V); and, in what the parties call the "ten-percent" claim, by allowing more than ten percent of the Plan's assets to be invested in Baxter common stock (Count VI).

### III.   LEGAL STANDARD

Summary judgment is warranted where "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008); *see also Bassiouni v. F.B.I.*, 436 F.3d 712, 721 (7th Cir. 2006) (same for cross-motions). Normal burdens of proof remain, however. If a plaintiff has failed to establish a genuine issue of material fact regarding one of the elements of his case, then summary judgment will be entered in favor of the defendants. *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006); *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999). Meanwhile, the defendant bears the burden of establishing its claimed affirmative defense to be entitled to summary judgment on that basis. *Zenith Elecs. Corp. v. Panalpina, Inc.*, 68 F.3d 197, 201 (7th Cir. 1995).

### IV.   ANALYSIS

Defendants move for summary judgment on all of Rogers's claims, asserting that Rogers has not produced triable issues of fact to support any of his six causes of action. Defendants also raise two affirmative defenses, one of which, they urge, defeats all of Rogers's claims. Specifically, defendants argue that they are entitled to summary judgment on all of Rogers's claims because the Plan falls within the safe harbor provided by ERISA § 404(c), 29 U.S.C. § 1104(c). Rogers moves for summary judgment on his ten-percent claim only. The court first addresses the "safe harbor" defense.

### A.    Safe Harbor

ERISA § 404(c), 29 U.S.C. § 1104(c), exempts fiduciaries of a "plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account" from liability "for any loss, or by reason of any breach, which results from that participant's or beneficiary's exercise of control."  29 U.S.C. § 1104(c)(1)(B); *see also* 29 C.F.R. § 2550.404c-1(d)(2)(i).  To qualify as a § 404(c) plan and fall within this safe harbor, a plan must meet five requirements, several of which have numerous sub-requirements.  Specifically, a plan must: (1) provide for individual accounts; (2) allow participants the opportunity to exercise control over their accounts; (3) provide participants with the opportunity to choose from a broad range of investment alternatives; (4) give participants sufficient information to make informed investment decisions; and (5) where the plan offers qualifying employer securities, provide additional safeguards.  29 C.F.R. § 2550.404c-1(b) & (d)(2)(ii)(E)(4); *see also Hecker v. Deere & Co.*, 556 F.3d 575, 587 (7th Cir. 2009), *pet. for reh'g and reh'g en banc denied*, *Hecker v. Deere & Co.* (*Hecker II*), 569 F.3d 708 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 1141 (2010).

### 1.    Individual Accounts

The parties do not dispute that the Plan satisfied the first requirement for a § 404(c) plan–*i.e.*, that the Plan provided for individual accounts for participants and beneficiaries.

### 2.    Opportunity to Exercise Control

To have an opportunity to exercise control over assets in his account, a participant must be given "a reasonable opportunity to give investment instructions . . . to an identified plan fiduciary who is obligated to comply with such instructions . . . ."   29 C.F.R. § 2550.404c-

1(b)(2)(i)(A); *see also Hecker*, 556 F.3d at 587. The parties do not dispute that the Plan met this criterion. (*See* Pl.'s Resp. ¶¶ 57-63.)[4]

3.   Broad Range of Investment Alternatives

The third requirement to satisfy the safe harbor is that Plan participants and beneficiaries must be afforded a "broad range of investment alternatives." Investment alternatives are sufficiently broad only if they offer the participant the opportunity to: (1) materially affect the potential return on his investments; (2) choose from at least three investment alternatives, each of which is diversified and has materially different risk and return characteristics, and, when combined with other investment alternatives, allows the participant the opportunity to achieve a diversified portfolio with minimized risk and return; and (3) diversify the investment of the assets in his individual account. 29 C.F.R. § 2550.404c-1(b)(3)(i); *see also Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 878 (N.D. Ill. 2009). Rogers does not dispute that the Plan offered a broad range of investment alternatives, and the court finds that the Plan did so.[5]

---

[4]   Rogers argues that defendants failed to disclose material nonpublic facts to Plan participants. This argument is more relevant to the question of whether Plan participants had sufficient information regarding investment alternatives which, the Seventh Circuit stated in *Hecker*, is separate from the question of whether Plan participants had the opportunity to exercise control over their accounts. 556 F.3d at 587. The court therefore addresses Rogers's argument in evaluating whether Plan participants had sufficient information regarding investment alternatives, at section IV.A.4.

[5]   Specifically, Plan participants were offered five diversified investment options, *see* Defs.' Ex. D-3, at 8-9; *see also* Defs.' Ex. D-6, at BAXR01977, and several thousand mutual funds through a self-managed brokerage window. The available alternatives included composites of Treasury bonds, fixed-income securities, and investment contracts. These alternatives had materially different risk and return characteristics, allowed Plan participants the opportunity to materially affect their potential return and risk exposure, and allowed Plan participants to create a diversified portfolio with minimized risk.

Rogers agrees that the documents cited above "state that the investment options had materially different risk/return characteristics" but, Rogers argues, those documents "do not independently establish that such is true." (Pl.'s Resp. ¶ 43.) Rogers offers no evidence to suggest that the investment options differed from the description provided by Plan documents (except for the Baxter Common Stock Fund, which, according to Rogers, differs in a way that is immaterial to whether the investment options had materially different risk and return characteristics). Without a citation suggesting that the description of these investment alternatives was inaccurate, the court deems the statement of fact admitted.

4.      Sufficient Information to Make Informed Decisions

The safe harbor next requires that Plan participants be provided "sufficient information to make informed decisions with regard to investment alternatives under the plan . . . ."  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B).  Department of Labor regulations set forth nine criteria, all of which must be satisfied for the participant to be considered to have sufficient investment information.  *See id.* § 2550.404c-1(b)(2)(i)(B)(1)(i)-(ix).  These criteria require that participants and beneficiaries be given: (1) an explanation that the plan is intended to be a § 404(c) plan;[6] (2) a description of the investment alternatives available under the plan; (3) an identification of any designated investment managers; (4) an explanation of the circumstances under which participants and beneficiaries may give investment instructions; (5) a description of any transaction fees and expenses; (6) the contact information of the plan fiduciary responsible for providing information to participants; (7) a description of confidentiality procedures related to the purchase or sale of employer stock; (8) particular materials regarding investment alternatives subject to the Securities Act of 1933; and (9) materials related to voting, tender, and similar rights incidental to the holdings in their accounts.  *Id.*; *see also Hecker*, 556 F.3d at 587.  In addition to these nine criteria, each participant must be provided, on request, "extensive information on the operating expenses of the investment alternatives, copies of relevant financial information, and other similar materials."   *Hecker*, 556 F.3d at 587 (citing 29 C.F.R. § 2550.404c–1(b)(2)(i)(B)(2)).

---

[6]      The relevant regulation states that participants and beneficiaries must be given "[a]n explanation that the plan is intended to constitute a plan described in section 404(c) . . . ."  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1).  The court notes that, in *Hecker*, 556 F.3d at 587, the Seventh Circuit stated that the § 404(c) defense requires the "clear labeling of the plan as a [§ 404(c)] instrument . . . ."  Neither the opinion nor the clear letter of the regulation imposes any requirement that *the plan label itself* as a § 404(c) plan.  Rather, if other plan documents, such as SPDs, provide such an explanation, the regulation and *Hecker* are satisfied.

The parties do not dispute that information and documents received by Plan participants satisfied eight of the nine requirements set forth above, or that the requisite additional "extensive information" was available to Plan participants upon request.[7]   However, Rogers asserts that Plan documents failed to describe the Baxter Common Stock Fund in sufficient detail to satisfy the second requirement above, which mandates that Plan participants be provided a "description of the investment alternatives available under the plan and, with respect to each designated investment alternative, a general description of the investment objectives and risk and return characteristics of each alternative . . . ." 29 C.F.R. § 2550.404c-1(b)(2)(1)(ii).

The parties agree that the relevant description of the Baxter Common Stock Fund appears in the SPD, which states:

> This fund invests primarily in Baxter common stock.  The value of this fund depends upon the changes in the stock's price as well as dividend income. Your investment has a potential for a high return, but you must consider the uncertainty of the market.  Although the fund holds some cash, it consists primarily of a single stock asset.  This means that the fund will move to reflect the price of the stock.

(Defs.' Ex. D-3, at 9.)   Earlier in the same document, a graphic indicates that the Baxter Common Stock Fund was among those Plan investment options with "Higher Risk."   (*Id.*, at 7.) A 2001 document entitled "Your Investment Options" that was mailed to Plan participants describes the investment objective of the Baxter Common Stock Fund was "[t]o provide employees with the opportunity to share in the long-term performance of the company."  (Defs.'

---

[7]       The SPD informed Plan participants that the Plan was intended to be a § 404(c) plan.  (*See* Pl.'s Resp. ¶ 48.)   An Investment Options booklet provided to all Plan participants identified designated investment fund managers, *see* Defs.' Ex. D-6, at BAXR 001977, while the SPD identified relevant Plan fiduciaries and their contact information.  (Defs.' Ex. D-3, at 1, 32, 33.)  The SPD explained how to give investment instructions, *id.*, at 10, and noted expenses and fees that would be assessed and in turn would affect Plan participants' balances.  (*Id.*, at 13.) The SPD likewise provided information regarding voting and tender rights related to account holdings, and regarding confidentiality procedures related to transactions in Baxter common stock.  (*Id.*, at 13-14.)  Finally, on request, Plan participants were provided the requisite extensive information regarding the various funds.  (Pl.'s Resp. ¶ 54; *see also* Defs.' Ex. D ¶¶ 18, 27.)

Ex. D-6, at BAXR 001976; *see also* Pl.'s Resp. ¶ 44.)   The document further notes that the

Baxter Common Stock Fund consists of "100% Baxter Common Stock" and, regarding the

fund's risk and return profile:

> With the majority of assets invested in a single company stock (the fund holds a small amount of cash), the risk to your principal is high to very high and volatility in the value of your investment is great.   Over the long term, Baxter stock has tended to track the performance of other large company stocks as reflected in the Standard & Poor's 500 Index.

(Defs.' Ex. D-6, at BAXR 001976-77.)

Rogers argues that the description was deficient because it did not disclose that "Baxter

had been repositioned from a value to a growth company, a material fact as to risk."   (*Id.*)

Rogers's value-to-growth argument is problematic in several respects.   First, the regulation at

issue requires only a "general description," not a list of all material facts about the investment

alternative.   Second, Rogers makes no reference to this repositioning from "value" to "growth"

anywhere in his Complaint, which he amended just prior to the filing of the instant motions, and

specifically makes no reference to the alleged repositioning among the eleven facts that Rogers

alleges in his Complaint should have been disclosed to Plan participants.   (*See* Compl. ¶ 34.)

Even if the court were inclined to overlook this deficiency, Rogers's argument fails because of a

lack of support in admissible evidence.   Documents that Rogers cites that might allow an

inference that Baxter in fact switched from a "value" to a "growth" stock either are inadmissible

(such as the newspaper article in discussed footnote 1 above) or are of unclear provenance, and

do not allow the inference that Plan fiduciaries knew or should have known of their existence or

content.   (*See* Pl.'s Resp. Ex. 47.)   Rogers does not attempt to show that defendants, either

generally or individually, knew or should have known of the existence or content of each of the

documents he cites.

As stated above, the SPD informed participants that the Baxter Common Stock Fund was a single-company stock fund and was a riskier investment, and that the value of the fund was tied to the price of the stock, while the Your Investment Options booklet bolstered the SPD's general description by further describing the investment objectives and risk and return profile of the Baxter Common Stock Fund. The *Lingis* court found that a description and graphic similar to those provided in the SPD were sufficient to satisfy the regulatory requirements of the "general description." *Lingis*, 649 F. Supp. 2d at 871. Given that Plan participants in this case were given more than just the SPD's description and graphic, the court concludes that they were provided with a sufficient description of the Baxter Common Stock Fund..

Rogers argues that even if participants were provided with the requisite general description of the Baxter Common Stock Fund, defendants cannot assert the safe harbor because they "failed to disclose the risks caused by Baxter's 2002 unreachable commitments and the true state of its prospects." (Pl.'s Resp. Br. 47.) Rogers's argument lacks support. The relevant Department of Labor regulation provides that the safe harbor defense is unavailable where a "plan fiduciary has *concealed* material non-public facts regarding the investment from the participant or beneficiary . . . ." 29 C.F.R. § 2550.404c-1(c)(2)(ii) (emphasis added). Multiple courts have noted that, while a failure to disclose is a passive shortcoming, concealment requires affirmative conduct. *Lingis*, 649 F. Supp. 2d at 880 (citing *In re Unisys Corp Retiree Med Benefit "ERISA" Litig.*, 242 F.3d 497, 503 (3d Cir. 2001)). Rogers has not shown that Plan fiduciaries affirmatively concealed facts from Plan participants. Specifically, Rogers points to no evidence that defendants were aware of any "true state of . . . prospects" that differed from what was reported publicly or to participants, or that they were aware of some risk of not

achieving external commitments, and that they sought to conceal any such facts from Plan participants.

Moreover, as Rogers acknowledges, defendant fiduciaries' obligation not to conceal material facts is limited where the "disclosure of such information by the plan fiduciary to the participant or beneficiary would violate any provision of federal law or any provision of state law which is not preempted by the Act." 29 C.F.R. § 2550.404c-1(c)(2)(ii).  The Seventh Circuit has twice noted, including on interlocutory appeal in this case, the potential insider trading issues posed by disclosure only to plan participants.  *See Rogers*, 521 F.3d at 706; *Harzewski v. Guidant Corp.*, 489 F.3d 799, 808 (7th Cir. 2007).  Rogers does not explain how defendants could have disclosed material facts to Plan participants, but not to the public as a whole, without violating the insider trading prohibitions in federal securities laws.[8]

In light of Plan documents' provision of the requisite general description of the Baxter Common Stock Fund, and the absence of support for Rogers's argument that defendants concealed material non-public facts from participants, the court concludes that Plan participants were provided with sufficient information as required by regulation.

5.    Offering of Employer Securities

Defendants next maintain that they have satisfied the nine additional requirements necessary to qualify for the § 404(c) defense, given that the Plan offered employer securities.  *See* 29 C.F.R. § 2550.404c-1(d)(2)(ii)(E)(4)(i)-(ix).  In order to meet this requirement, employer securities must be: (1) qualifying employer securities; (2) stock; (3) traded on a national

---

[8]    Rogers proposes several alternatives that Plan fiduciaries could have taken to protect Plan participants; however, none of these alternatives–which include reporting concerns to the General Counsel or Corporate Secretary, reporting concerns to Baxter's independent directors, and placing a cap on the amount of participants' holdings of Baxter common stock–provide for a disclosure to Plan participants of any material non-public facts, and none address the insider trading concerns that any such disclosure would create.

exchange; and (4) traded with such frequency and volume to assure that directions to purchase or sell may be acted upon promptly and efficiently. *Id.* § 2550.404c-1(d)(2)(ii)(E)(4)(i)-(iv). Further, (5) any information provided to shareholders of the employer security must be provided to any participant holding such securities; (6) participants holding employer securities must have voting, tender, and similar rights; (7) information related to the purchase, holding, and sale of securities must be maintained in accordance with confidentiality procedures; (8) the plan must designate a fiduciary for ensuring that the confidentiality procedures are adequate, and that any independent fiduciary is appointed as needed; and (9) an independent fiduciary must be appointed to investigate any situation in which the designated plan fiduciary determines the potential for undue employer influence with regard to the exercise of shareholder rights related to employer securities exists. *Id.* § 2550.404c-1(d)(2)(ii)(E)(4)(v)-(ix). Rogers does not dispute that the Plan satisfied these nine requirements, *see* Pl.'s Resp. ¶ 64, and the evidence bears out that these requirements were met.[9]

### 6. Whether the Plan was Determined to be a § 404(c) Plan

Rogers asserts that even if the Plan satisfied each of ERISA's requirements for the safe harbor, the Plan is not a § 404(c) plan because the Investment Committee never determined that the Plan would come within that safe harbor. The source of Rogers's novel, but ultimately unpersuasive, argument is the Plan, which states:

---

[9]     Specifically, Baxter common stock was both stock and a qualifying employer security. It was publicly traded on the New York Stock Exchange with sufficient frequency and in sufficient volume that Plan participants' directions to buy or sell Baxter common stock would be acted upon the same day. (Pl.'s Resp. ¶ 64.) Plan participants investing in Baxter common stock had voting, tender, and similar rights in Baxter, and information provided to Baxter shareholders was also given, through the Plan's trustee, to Plan participants investing in Baxter common stock. (*Id.* ¶¶ 65-67.) The Plan had procedures to ensure that Plan participants' exercise of voting, tender, and similar rights was confidential, *id.* ¶ 68, and that participants' purchases, sales, and holdings of Baxter common stock were likewise kept confidential. (*Id.* ¶ 71.) The Investment Committee was designated to monitor compliance with those confidentiality procedures. (*Id.* ¶ 70.) Finally, the Investment Committee never found any potential for undue influence by Baxter upon Plan participants and fiduciaries. (*Id.* ¶ 71.)

> *If the Investment Committee determines that* Participants shall exercise discretion and control over the investment of their accounts in a manner intended to insulate Plan fiduciaries from liability for investments under Section 404(c) of ERISA, then the investment funds established by the Investment Committee pursuant to this Section 6.3 shall afford Participants with a broad range of investment alternatives . . . .

(*See* Pl.'s Ex. A, § 6.3, at 27 (emphasis added).)  Later, the Plan repeats the "if the Investment Committee determines" language, requiring that if the plan was to be a § 404(c) plan, then the Investment Committee was required to provide Plan participants with sufficient information, as defined by regulation and discussed above.  (*Id.*, § 6.5, at 31-32.)  Rogers interprets the emphasized language as a Plan-imposed requirement that the Investment Committee "determine[]" that the Plan be a § 404(c) plan for the Plan to be so classified.  Without evidence that the Investment Committee made such a determination, according to Rogers, the Plan could not be a § 404(c) plan.

Rogers points to no provision in ERISA or its regulations that requires such a determination and, based on the court's review of the above-described regulations, no such legal requirement of a determination exists.  A review of the complete subsections cited above reveals that the Plan attempted to ensure that the Investment Committee complied with the safe harbor's regulatory requirements in the event that Plan participants were afforded the opportunity to control their own accounts.  The Plan does not suggest that the Investment Committee was required to manifest its determination that the Plan was to be a § 404(c) plan by doing anything beyond the offering of a broad range of investment alternatives and providing sufficient information to Plan participants.  Had the Plan's drafters intended to require that the Investment Committee make a separate, affirmative determination, they could have formulated the paragraph above in any number of other ways, such as specifically mandating that the Investment Committee state in writing that the Plan was to be a § 404(c) plan.  The clauses

17

above do not mandate an explicit determination, but rather the provision of sufficient information to Plan participants and the offering of a broad range of investment alternatives, both of which the court has found to be satisfied here.[10]

> 7.      Whether the Investment Committee Violated Its Duty of Loyalty

Rogers further argues that the Plan could not be a § 404(c) plan because, if the Investment Committee determined that the Plan would be a § 404(c) plan, it would violate its duty of loyalty to Plan participants.  ERISA imposes on fiduciaries a duty to act "solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).  According to Rogers, if the Investment Committee determined the Plan to be a § 404(c) plan, the Investment Committee must have acted in its own self-interest, and not in the interest of Plan participants.  Rogers offers no evidence that the Investment Committee, in complying with the safe harbor regulations, was motivated by any interest except that of Plan participants and beneficiaries.  The Investment Committee may have offered the requisite investment information, investment alternatives, and account control to Plan participants and beneficiaries because the committee's members thought that such an offering would benefit the participants and beneficiaries.  Without any supporting evidence, Rogers's argument fails.

**B.      Rogers's Claims**

Rogers argues that even if defendants have established the § 404(c) defense generally, the defense "is not available as a defense to certain of the claims" he asserts.[11]  (Pl.'s Resp. Br. 47.)

---

[10]      The court finds that evidence of a determination was not required, rendering Rogers's argument that certain Plan documents issued by the Administrative Committee are not evidence of the Investment Committee's determination irrelevant.

[11]      By "certain," Rogers does not mean all.  He advances no argument and points to no authority suggesting that § 404(c) is inapplicable to his claims that defendants failed to diversify Plan assets (alleged as part of Count I), offered an imprudent investment alternative, namely, the Baxter Common Stock Fund (Count II), and violated their duty of loyalty (Count IV).  (Rogers makes a cursory reference to "Counts I-III," *see* Pl.' Resp. Br. 47, but does not mention his diversification claim or his imprudent investment alternative claim.)  Without any argument that the safe

Rogers's argument derives from the text of the safe harbor itself, which exempts fiduciaries from liability "for any loss, or by reason of any breach, which results from [a] participant's or beneficiary's exercise of control." 29 U.S.C. § 1104(c)(1)(B). The implementing regulations take a narrower view of "results from," protecting plan fiduciaries only from those losses that are "the direct and necessary result of [a] participant's or beneficiary's exercise of control." 29 C.F.R. § 2550.404c-1(d)(2)(i). According to Rogers, his claims assert liability for losses "result[ing] from" defendants' actions, not from Plan participants' exercise of control.

Multiple appellate opinions have addressed the applicability of the § 404(c) safe harbor defense to particular claims. In *Hecker*, cited by defendants, plaintiffs alleged that the defendant offered an imprudent investment alternative, which was allegedly imprudent because of the fees associated with investing in it. 556 F.3d at 589. The defendant urged that the § 404(c) safe harbor defense defeated plaintiffs' claims. *Id.* at 588-89. The *Hecker* court found that the safe harbor applied to plaintiffs' claims because the fees that were the basis of the alleged imprudence were disclosed to Plan participants, meaning that any losses resulted from participants' informed choices, rather than from the defendants' election of investment alternatives. *Id.* at 589-90. In denying rehearing, the Seventh Circuit emphasized that in its original opinion, it had "refrained from making any definitive pronouncement" on the more general scope of the safe harbor. *See Hecker II*, 569 F.3d at 710.

*Hecker* cited the remaining appellate decisions on the question of whether the safe harbor applies to particular claims. In two cases, the courts, as in *Hecker*, indicated that a defendant could raise the safe harbor defense against a claim for imprudent selection of investment

harbor does not apply to those counts, the court finds that Rogers has waived any objection to its application. The court grants summary judgment in defendants' favor on Counts II and IV, and on Count I insofar as Rogers alleges a failure to diversify.

alternatives, but, as in *Hecker*, refrained from a broad-based holding.   *See Langbecker v. Elec.
Data Sys. Corp.*, 476 F.3d 299, 310-13 (5th Cir. 2007) (finding district court erred by failing to
consider the effect of the safe harbor on the claims before it); *see also In re Unisys Sav. Plan
Litig.*, 74 F.3d 420, 445 (3d Cir. 1996) (noting that the safe harbor "allows a fiduciary, who is
shown to have committed a breach of duty in making an investment decision, to argue that
despite the breach, it may not be held liable because the alleged loss resulted from a participant's
exercise of control.").[12]   Given this precedent, the safe harbor invoked by defendants may
potentially apply to each of Rogers's claims, but a closer examination of each claim and the safe
harbor's application thereto is necessary.

      1.   Mismanagement of Plan Assets

With regard to Count I, Rogers argues that the defendants "failed to prevent the wasting
of Plan assets," and that "No Plan participant had anything whatsoever to do with the failure of
the Plan fiduciaries to protect Plan assets here . . . ."  (Pl.'s Resp. Br. 48.)  The safe harbor, by its
terms, applies "only with respect to a transaction where a participant or beneficiary has exercised
independent control in fact with respect to the investment of assets in his individual account
. . . ."  29 C.F.R.  §  2550.404c-1(c)(1)(i).   As explained above, Plan participants, not Plan
fiduciaries, directed the investment of Plan assets.   By providing Plan participants and
beneficiaries with the requisite control over their accounts (in addition to the requisite
information and range of investment alternatives) to satisfy the safe harbor defense, defendant
fiduciaries ceded control of the assets in each individual Plan participant's account to each

---

[12]      The Fourth Circuit also analyzed the question in a footnote, noting that the safe harbor would *not* protect
fiduciaries from claims for the imprudent selection of investment funds, relying on the Department of Labor's stance
on the same issue.  *See DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3 (4th Cir. 2007).  Rogers does not cite
*DiFelice* or even urge its application here.   Such an application would be inconsistent with *Hecker*, in which the
Seventh Circuit afforded the Department of Labor's interpretation less deference, and reached a result that was, at
least based on the allegations before it, inconsistent with *DeFelice*.  *See Hecker*, 556 F.3d at 589-90.

participant.  In so doing, defendant fiduciaries also ceded responsibility for decisions regarding how those assets would be invested and agreed to follow participants' investment instructions. Plan participants then decided whether to invest the assets of their individual accounts in Baxter common stock or one of the many other investment alternatives.  Any "wasting of Plan assets," the wrong alleged by Rogers in Count I, was the result of individual participants' acquisitions of Baxter common stock, not of defendants' conduct.  The safe harbor therefore applies to Count I.

    2.   <u>Misstatements or Omissions</u>

In Count III, Rogers argues that the defendants "failed . . . to make necessary disclosures to Plan participants about the risks of investing in Baxter stock," resulting in losses to the Plan that were not due to Plan participants' exercise of control.  In briefing, Rogers argues that defendants' failures to make necessary disclosures resulted in the participants' losses.  ERISA imposes on fiduciaries a duty to act solely in the interest of plan participants, *see* 29 U.S.C. § 1104(a)(1), which includes the duty not to misstate material facts to plan investors.  *See Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996); *see also Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000).  While the *Lingis* court suggested that the safe harbor defense *does not* protect a defendant fiduciary who misspeaks or omits material facts, 649 F. Supp. 2d at 874-75, this court need not resolve whether the safe harbor applies to this claim because Rogers's claim fails on its merits.

Rogers asserts that defendants made material misstatements and omissions both in the SPDs they provided to Plan participants and in their public statements.  Rogers asserts that the SPDs were misleading because they were not updated to reflect Baxter's alleged shift from a "value" to a "growth" strategy, and did not adequately describe the nature of the risk of investing in the Baxter Common Stock Fund.  However, as explained above, the SPD and other plan

documents adequately described the Baxter Common Stock Fund and there is insufficient evidence to conclude that any "value"-to-"growth" shift ever occurred. Moreover, Rogers again fails to explain how defendants could have disclosed material facts to Plan participants without violating insider trading prohibitions in federal securities laws. *See Harzewski*, 489 F.3d at 808 (noting that an ERISA fiduciary's duty "does not extend to violating the law").

Rogers also asserts that misstatements and omissions from public statements and securities filings by Baxter and its officers render defendants liable as ERISA fiduciaries. Rogers specifically argues that defendants "systematically concealed and mislead [*sic*] the market about Baxter's ability to achieve its stated commitments." (Pl.'s Resp. Br. 42.) This argument is legally and factually flawed. A person is a fiduciary under ERISA only "to the extent" that he acts in a fiduciary capacity. *See* 29 U.S.C. § 1002(21)(A). The Supreme Court has observed that an ERISA fiduciary wears "two hats," one fiduciary and one not, *Pegram v. Hedrich*, 530 U.S. 211, 225-26 (2000), leading several courts to conclude that a person who makes a public statement, such as in a securities filing, does not make that statement in a fiduciary capacity. *See Lingis*, 649 F. Supp. 2d at 874-75; *see also Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 257 (5th Cir. 2008); *Stein v. Smith*, 270 F. Supp. 2d 157, 173 (D. Mass. 2003). Therefore, Rogers's argument that defendants misled "the market" concerns non-fiduciary communications. Moreover, Rogers points to no specific misstatements or omissions, instead arguing that defendants "systematically" misled the market. Without a specific reference to or evidence of a misstatement or omission, the court cannot conclude that a triable issue of

fact supports Rogers's claim that defendants are liable for omissions or misstatements.[13]

Defendants' motion for summary judgment is granted on Count III.

3.    Ten-Percent Claim

Rogers also argues that his ten-percent claim is not covered by the safe harbor defense.

Resolution of this issue first requires a clearer understanding of the ten-percent claim's statutory

basis.   As Rogers points out, the ten-percent claim is in fact two separate claims, one for

*acquiring* more than ten percent of plan assets in employer securities, the other for *holding*

employer securities in too great a volume.   Section 1106(a) of Title 29 of the United States Code

restricts fiduciaries as follows:

> (1)    A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> . . .
>
> (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.
>
> (2)    No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.

29 U.S.C. § 1106(a).  Both prohibitions on fiduciary conduct reference, and are premised on, a

violation of 29 U.S.C. § 1107(a), which imposes the ten-percent prohibition as follows:

---

[13]     Rogers also asserts, in a footnote and without citation to relevant legal authority, that the defendants' public statements should be imputed to the defendants as fiduciaries because the SPD incorporated those public statements. Even assuming that this theory is viable, which this court doubts, *see In re Bausch & Lomb Inc. ERISA Litig.*, No. 06 C 6297, 2008 WL 5234281, at *7-*8 (W.D.N.Y. Dec. 12, 2008) (holding that incorporated SEC filings do not become fiduciary communications), and even if the SPD incorporated certain statements, Defs.' Ex. D-3, at 15 (Plan participants "may obtain prospectuses, financial statements, and other reports relating to an investment fund to the extent that such reports are provided to the Plan."), Rogers's assertion still fails because he does not indicate which "prospectuses, financial statements, and other reports" were provided to the Plan, or which misstatements or omissions those documents contained.

(2)     A plan may not acquire any qualifying employer security or qualifying employer real property, if immediately after such acquisition the aggregate fair market value of employer securities and employer real property held by the plan exceeds 10 percent of the fair market value of the assets of the plan.

(3)     (A) After December 31, 1984, a plan may not hold any qualifying employer securities or qualifying employer real property (or both) to the extent that the aggregate fair market value of such securities and property determined on December 31, 1984, exceeds 10 percent of the greater of—

    (i) the fair market value of the assets of the plan, determined on December 31, 1984, or

    (ii) the fair market value of the assets of the plan determined on January 1, 1975.

*Id.* § 1107(a).

The two subsections quoted above treat acquiring qualifying employer securities differently from the holding of such securities.  Section 1106(a)(2) prohibits a fiduciary from permitting the plan to hold qualifying employer securities in any way that violates § 1107(a), which penalizes *holding* of securities only if the aggregate value of such securities, determined on December 31, 1984 exceeds ten percent of the value of the assets of the plan on either December 31, 1984 or January 1, 1975, whichever value is greater.  *Id.* § 1107(a)(3).  Rogers has produced no evidence of the value of Baxter common stock in 1984 or the value of Plan assets in 1975 or 1984; in fact, there is no evidence that the Plan existed in either of those prior years. Rather, Rogers's evidence is of the values of Plan assets and Baxter common stock from 2001 through 2003.  (*See* Defs.' Resp. ¶¶ 22-32.)  The evidence presented on Rogers's "holding" claim fails to satisfy the plain statutory language, and therefore fails on its merits.

Rogers asserts that he nevertheless has a ten-percent claim because the Plan continued to acquire Baxter common stock.  Section 1106(a)(1)(E) prohibits a fiduciary from *causing* the plan to engage in a transaction that he knows or should know constitutes an acquisition of qualifying

employer securities in violation of § 1107(a); an acquisition violates § 1107(a) if "immediately after such acquisition the aggregate fair market value of employer securities and employer real property held by the plan exceeds 10 percent of the fair market value of the assets of the plan." 29 U.S.C. § 1107(a)(2); *see also Tullis v. UMB Bank, N.A.*, 640 F. Supp. 2d 974, 981 (N.D. Ohio 2009) ("[S]ection 406 of ERISA clearly prohibits fiduciaries from *causing* the plan to engage in prohibited transactions, rather than simply allowing such transactions to occur.").   Rogers produces evidence supporting his claim that Plan participants directed the acquisition of Baxter common stock, and that, directly after those acquisitions, the percentage of Plan assets invested in Baxter common stock exceeded ten percent.  (*See* Pl.'s Resp. Ex. 69, at 221:7-224:12; 228:4-230:15; *see also* Defs.' Resp. ¶¶ 22-32.)[14]

Both Rogers's ten-percent claim and the applicability of defendants' safe harbor defense to the ten-percent claim, then, hinge on who *caused* the offending acquisitions of Baxter common stock.  *Accord Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982) (finding that the phrase "result from" requires causation).   Rogers asserts that the safe harbor defense does not apply to his ten-percent claim because "there is nothing any individual participant could or could not have done to keep the Baxter common stock from amounting to more than ten percent of the Plan's total assets."  (Resp. Br. 49.)[15]  Defendants reply that the acquisitions at issue could not

---

[14]    Rogers produced this evidence supporting his "acquiring" claim in response to defendants' motion for summary judgment, and first argued that the evidence applies to his ten-percent claim in his reply to his motion for partial summary judgment.  By failing to raise this evidence in his opening brief, Rogers waived it as support for his own motion.  His motion is therefore denied.

Similarly to Rogers, defendants chose to raise certain arguments only in later briefing.   Specifically, defendants assert in response to Rogers's motion, and again in a footnote to their reply in support of their motion, that Rogers suffered no injury-in-fact with regard to his ten-percent claim and that his ten-percent claim is barred by the statute of limitations.   The court need not consider these arguments as responses to Rogers's motion, which has been denied on a separate ground.   The court will not consider these arguments in support of defendants' motion, as the arguments appear for the first time in a footnote to their reply.

[15]    In support of his argument, Rogers cites several Department of Labor interpretations suggesting that prohibited transactions are not protected by the safe harbor defense, but cites no authority discussing the applicability of the safe harbor to the ten-percent rule.   Prohibited transactions, aside from the ten-percent rule,

have happened *but for* participants' directions to invest in Baxter common stock, meaning that any losses resulted from participants' exercise of control over Plan assets.

The evidence and relevant regulations indicate that any acquisitions that violated the ten-percent rule were caused by the sum of individual participants' choices in exercise of their control over their individual accounts, not from defendants' conduct.  Section 404(c) and the above-described regulations prescribe the inputs a fiduciary must provide to a participant's investment decision–the available investment alternatives, the information available regarding each alternative, and the participant's control in choosing between the alternatives–but, once the inputs are satisfied, largely absolves fiduciaries from the outputs of those decisions.  Indeed, the safe harbor regulations require that Plan participants have the opportunity to direct the investment of assets in their account by giving instructions "to an identified Plan fiduciary *who is obligated* to comply with such instructions." 29 C.F.R. § 2550.404c-1(b)(2)(i) (emphasis added).[16]

Because the fiduciary is obligated to comply with investment instructions, the Department of Labor has determined that the safe harbor shields a fiduciary from an individual participant's concentration of *all* of his account assets in a single stock, *see id.* § 2550.404c-

---

largely concern transactions with interested parties.  The Department of Labor interpretations suggest that the safe harbor *does not* protect a fiduciary who, receiving a general instruction to invest, elects to invest by means of a transaction with an interested party; the same interpretations suggest that the safe harbor *would* protect the fiduciary if the participant specifically directed a transaction with the interested party.  *Compare* 29 C.F.R. § 2550.404c-1(f)(6) & (7).  Unlike the first example, but like the second example, this case does not involve a discretionary choice by Plan fiduciaries; Plan participants instructed the trustee to acquire Baxter common stock, and the trustee was bound to comply with that instruction.  If any interpretation by the Department of Labor is relevant to this case, it is the second example, in which the fiduciary has no discretion, and therefore can avail himself of the safe harbor.

[16]      The general duty of a § 404(c) fiduciary to obey instructions is subject to two exceptions, neither of which applies here.  The first exception concerns instructions pertaining to employer property and securities that fall within 29 C.F.R. § 2550.404c-1(d)(2)(ii); the first exception does not apply to the Plan in this case because 29 C.F.R. § 2550.404c-1(d)(2)(ii) itself contains an exception for plans that allow transactions in employer securities but also provide the required additional safeguards, which the Plan in this case did, as explained in section IV.A.5 above.  The second exception concerns plans that expressly permit fiduciaries to decline to implement investment instructions by participants and beneficiaries.  *See* 29 C.F.R. § 2550.404c-1(b)(2)(ii)(B).  The parties point to no provision of the Plan that permitted its fiduciaries to decline participant instructions.

1(f)(5), even though that concentration of assets in a single stock might be imprudent if the fiduciary had chosen to do so in exercise of its discretion.   There is no indication that the Department of Labor interprets the safe harbor differently if several participants decided to make the same non-diversified investment so that a large percentage of plan assets would be invested in a single stock.   *Cf. In re Unisys Sav. Plan Litig.*, 74 F.3d at 448 (noting that the safe harbor would protect against a claim for a breach of duty to diversify plan assets, provided that losses at issue occurred after plaintiffs exercised control by making informed decisions regarding the investment of their individual accounts).   Here, fully informed Plan participants (or at least participants with the opportunity to be fully informed) decided to invest their individual accounts' assets in a way that caused up to 17.7 percent of the total amount of Plan assets to be concentrated in Baxter common stock.   Plan fiduciaries were obligated to obey the investment instructions of participants, and so are not liable for any resulting losses which were caused by participants', not the fiduciaries', decisions.   Defendants are entitled to summary judgment on Count VI.[17]

4.   Failure to Monitor

Finally, Rogers argues that his failure to monitor claim survives the safe harbor defense because "the duty to monitor is independent of whatever investment choices individual plan participants make . . . ."   (*Id.* 48.)   However, several courts have held that a failure to monitor claim is derivative in nature and must be premised an underlying breach of fiduciary duty.   *See In re Harley-Davison, Inc. Secs. Litig.*, 660 F. Supp. 2d 953, 968-69 (E.D. Wis. 2009); *see also*

---

[17]     Because the court finds that the safe harbor applies to Rogers's ten-percent claim, it need not address whether defendants are separately entitled to summary judgment on the ground that the Plan was an "eligible individual account plan," *see* 29 U.S.C. § 1107(b)(1) & (d)(3), or whether defendants Kraemer and Baxter are separately entitled to summary judgment because they were not Plan fiduciaries.

*In re RadioShack Corp. "ERISA" Litig.*, 547 F. Supp. 2d 606, 616 (N.D. Tex. 2008).  Without an underlying breach of fiduciary duty, Rogers's claim for failure to monitor fails on its merits.

## V.    CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted, and Rogers's motion for partial summary judgment is denied.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: May 3, 2010